UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| **IN RE: PLIMSOLL MARINE, INC.** | **CIVIL ACTION**<br><br>**NO: 19-14757**<br><br>**SECTION: "H"** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a limitation action brought by Plimsoll Marine, Inc. ("Plimsoll") as owner of the M/V OKALOOSA ("the OKALOOSA"), arising out of an allision on the Mississippi River on June 30, 2019 with water intake dolphin structures owned by Claimant the City of Gretna ("Gretna"). Plimsoll has filed a Third-Party Complaint against Empire Stevedoring, Inc. ("Empire") and the Board of Commissioners of the Port of New Orleans ("the Port") and has tendered them to Gretna under Federal Rule of Civil Procedure 14(c), alleging that they are at fault for the allision under general maritime law.

This case proceeded to a bench trial on March 9 through 11, 2022. Having considered the evidence admitted at trial, the arguments of counsel, and the pre-trial briefing, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

1

# FINDINGS OF FACT

1. The Port is the owner of First Street Wharf ("the Wharf"), which was the subject of a lease agreement between the Port and Empire, dated October 29, 2014.

2. At all relevant times, Empire was the lessee of the Wharf and its exclusive operator. It did not, however, enjoy exclusive use of the Wharf, and other vessels were permitted to tie up at the Wharf as well.

3. As lessee of the Wharf, Empire was obligated to maintain it as a public maritime cargo terminal.

4. At all relevant times, Plimsoll was the owner of the M/V OKALOOSA, a U.S. flagged inland towing vessel, bearing official no. 560924 with an overall length of 66.4 feet.

5. At all relevant times, Calvin Williams was the Captain of the OKALOOSA.

6. At all relevant times, Gretna was the owner of three water intake defender dolphin structures across the Mississippi River from the Wharf.

**Procedural Background**

7. Following an incident involving the OKALOOSA on June 30, 2019, Plimsoll initiated this limitation action seeking exoneration from or limitation of liability pursuant to the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30501 et al.

8. Gretna was the only party to file a claim in that limitation action claiming that the water intake dolphins owned by Gretna had been damaged by the OKALOOSA as a result of the vessel alliding with them.

9. Plimsoll then filed a Third Party Complaint against Empire and the Port pursuant to Federal Rule of Civil Procedure 14(a) and 14(c), asserting that Empire and the Port are liable under general maritime law for any damage to the OKALOOSA and for any damage caused to Gretna. Plimsoll contends that Empire and the Port breached their duty to provide a safe berth.

**The Incident**

10. On Sunday, June 30, 2019, employees of Empire unloaded cargo from a cargo ship onto two barges that were located on the river side of the cargo ship. Upon completing the loading of the barges, Empire contacted the fleet to release the barges to their care. Someone from dispatch with the fleet requested permission to hold the barges at the Wharf, which Empire granted. Around 1330, the Old Glory tug delivered an empty barge to the cargo ship and moved the two full barges to the Wharf. Deckhands on the Old Glory tied the barges to the Wharf. Empire's employees continued unloading the cargo ship into the empty barge.

11. At about 1930, Empire again contacted the fleet to request that the barges be picked up from the Wharf. The OKALOOSA was dispatched to pick up the two barges from the Wharf.

12. Upon approaching the Wharf, Capt. Williams noticed a line tied to bollard #21 and hanging into the water approximately 100 feet upriver from where the OKALOOSA tied up. Capt. Williams could not see how long the line hung underneath the water.

13. At approximately 2245, while attempting to depart the Wharf with the two barges in tow, the OKALOOSA caught a line in its starboard propeller, which stopped the starboard engine.
14. The line that fouled the OKALOOSA's propeller was attached to the Wharf, preventing the vessel from navigating away from the dock and a nearby ferry.
15. The line that caught the OKALOOSA's propeller was under the water line. Because the incident occurred at night, the Captain could not see hazards beneath the water. The hazard was therefore hidden and not open and obvious.
16. Capt. Williams did not act negligently in failing to remove the line from the bollard prior to the incident or steer clear of it where the hazard presented by the line was hidden beneath the water.
17. As a result of her starboard engine being disabled, the OKALOOSA lost power and steerage. After he ordered the crew to evacuate the vessel, the Captain moved out onto the barges for his own safety.
18. Prior to evacuating the wheelhouse, the Captain was attempting to maneuver the OKALOOSA away from the dock and adjacent ferry. When he evacuated the wheelhouse for his own safety, he left the port engine in gear.
19. The incident was an emergency situation.
20. Capt. Williams did not act negligently in leaving the vessel in gear when he evacuated the wheelhouse. He exercised reasonable care given the emergency situation.

21. At some point, the OKALOOSA and the two barges in tow broke away from the Wharf and began to drift across the Mississippi River.
22. The OKALOOSA drifted to the Gretna water intake facility and contacted some or all of the defender dolphins protecting the water treatment pump.
23. No party was disciplined as a result of the incident.

**The Line**

24. Following the incident, a part of a ship line was removed from the starboard propeller of the OKALOOSA.
25. Both the portion of the line removed from the OKALOOSA propeller and the portion removed from the Wharf bollard were examined by Kyle Smith Marine Surveying, Inc. and Bartlett Engineering and tested by Akron Rubber Development Laboratory.
26. The line removed from the bollard had a manufactured spliced eye on one end and was tied in a bowline knot at the other with no measurable tail sticking out past the knot.
27. The line removed from the OKALOOSA's propeller had a manufactured spliced eye on one end and was frayed on the other.
28. This Court found the expert testimony of Robert Bartlett, an expert in engineering and material science in the field of maritime, credible and compelling. Mr. Bartlett opined that the line segments matched in size, material, construction, and internal and external coloring. He opined that the segments were pieces of the same line that broke at the bowline knot.

29. Based on Mr. Bartlett's testimony, this Court finds that the line removed from the bollard and the line removed from the OKALOOSA were pieces of the same line.
30. Accordingly, the line hanging from bollard 21 of the Wharf caused the OKALOOSA's propeller to stall, which ultimately resulted in damage to Gretna's defender dolphins.

**Liability**

31. The line was left on the bollard by an unknown third party. The rope did not belong to Empire and was not placed on the Wharf by Empire.
32. Empire's employees regularly remove trash—such as a ship line left on the bollard—from the Wharf and were trained to do so. Empire's employees would have removed the line from the bollard if they had seen it.
33. Empire has two employees who clean and sweep the Wharf all day Monday through Friday.
34. The Wharf was cleaned on Friday, June 28, prior to closing for the weekend.
35. The Wharf is closed on the weekend and was therefore closed at the time of the incident.
36. There was no evidence that the ship line was placed on the bollard prior to the closing of the Wharf for the weekend.
37. Despite being closed, the Wharf was still used by vessels to tie up during the weekend.
38. Empire's employees were not working on the Wharf on the day of the incident. They were, however, unloading the cargo ship, which was

moored on the farthest end of the Wharf from where the OKALOOSA picked up the barges.

39. No Empire employees were working or present in the area where the rope was hanging from the bollard between close of business on Friday and the time the incident occurred on Sunday.

40. No one from Empire saw the rope on the bollard prior to the incident involving the OKALOOSA.

41. Empire exercised reasonable diligence to furnish a safe berth.

42. Empire was not negligent in failing to remove the rope from the bollard because it did not know or could not have known about the line placed on the bollard while the Wharf was closed and its employees were not present.

43. The unidentified third party who left the line on the bollard hanging into the water is 100% at fault for the incident and for the damage caused to the OKALOOSA and to Gretna's defender dolphins.

44. Because the responsible party was not named in this action, this Court need not quantify the amount of damages sustained by Gretna or Plimsoll.

## **CONCLUSIONS OF LAW**

1. The Court has admiralty jurisdiction over this matter, pursuant to 28 U.S.C. § 1333 and the parties' Rule 9(h) declaration. Venue is proper because a substantial part of the events giving rise to this claim occurred in this judicial district. 28 U.S.C. § 1391(b).

2. Plimsoll seeks limitation of liability under the Limitation of Liability Act. The Limitation of Liability Act provides in relevant part that "the liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight." 46 U.S.C. § 30505. Because the post-casualty value of the OKALOOSA plus pending freight exceeds the amount of the claims in this matter, limitation of liability is irrelevant.

3. "The rule of THE OREGON creates a presumption of fault that shifts the burden of production and persuasion to a moving vessel who, under her own power, allides with a stationary object. The rule of THE LOUISIANA creates the same presumption for a vessel who drifts into an allision with a stationary object." *Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 604 (5th Cir. 2010) (internal citations omitted).

4. "These presumptions shift the burden of production and persuasion on the issue of fault. . . . Application of [one of these presumptions] does not supplant the general negligence determination which requires a plaintiff to prove the elements of duty, breach, causation and injury by a preponderance of the evidence." *Id.* at 605.

5. "Evidentiary presumptions . . . are designed to fill a factual vacuum. Once evidence is presented . . . presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005) (internal quotation omitted).

6. A defendant can rebut either presumption if it can demonstrate: "(1) that the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident." *Combo Mar., Inc.*, 615 F.3d at 605.

7. Even assuming that the LOUISIANA Rule or the OREGON Rule applies here, Plimsoll carried its burden to show that the OKALOOSA acted with reasonable care given the emergency circumstances.

8. To establish maritime negligence, the claimant bears the burden of proving by a preponderance of the evidence that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; (3) the plaintiff sustained an injury; and (4) the breach caused the plaintiff's alleged injuries. *Canal Barge Co. v. Turco Oal Co.*, 220 F.3d 370, 376 (5th Cir. 2000).

9. "Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010).

10. Captain Williams and Plimsoll owed a duty of ordinary care under the circumstances.

11. Captain Williams and Plimsoll did not breach their duty of ordinary care given the emergency circumstances.

12. Empire and the Port owed a duty to provide a safe berth and remove hazards from the Wharf. A wharfinger is "'under a duty to exercise reasonable diligence to furnish a safe berth and to avoid damage to the vessel. This includes the duty to ascertain the condition of the berth, to make it safe or warn the ship of any hidden hazard or deficiency known

to the wharfinger or which, in the exercise of reasonable care and inspection, should be known to him and not reasonably known to the shipowner.'" *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (quoting *Trade Banner Line, Inc. v. Caribbean Steamship Co., S.A.*, 521 F.2d 229, 230 (5th Cir. 1975)). However, "it is well settled that a wharfinger is not the guarantor of the safety of a ship coming to his wharf." *Id.*

13. Empire and the Port did not breach their duty to Plimsoll where the hazard was not known and could not have been known to them.
14. Plimsoll's third-party claims against Empire and the Port are dismissed.
15. Gretna's claim in limitation against Plimsoll and claims pursuant to Rule 14(c) against Empire and the Port are dismissed.

## CONCLUSION

For the foregoing reasons, all claims in this matter are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana this 13th day of April, 2022.

_____
 **JANE TRICHE MILAZZO**
 **UNITED STATES DISTRICT JUDGE**